William R. Kent v. Commissioner.
Kent v. Commissioner
Docket No. 9352.
United States Tax Court
1947 Tax Ct. Memo LEXIS 231; 6 T.C.M. (CCH) 429; T.C.M. (RIA) 47110; April 25, 1947
*231 Lewis Donelson, III, Esq., and Allan Davis, Esq., 1224 Commerce Title Bldg., Memphis, Tenn., for the petitioner. John R. Stivers, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of deficiencies for the years 1940 and 1941, in the respective amounts of $6,030.44 and $57,142.02. The primary issue is the correctness of respondent's action in taxing petitioner upon partnership income which petitioner contends should be attributed to participating interests in the partnerships involved. There is a further issue as to whether petitioner is taxable on the gain resulting from the liquidation of a corporation upon the formation of one of the partnerships. Several minor issues are also presented, one of which has been disposed of by stipulation of the parties. The record consists of a stipulation of facts and evidence adduced at the hearing. Some of the facts in our findings are taken from the stipulation. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, a resident of Memphis, Tennessee, filed his income tax returns in the office of the collector *232 at Nashville, Tennessee. His books and returns for the years in question were on a calendar year cash receipts and disbursements basis. During the years in question petitioner was an executive of the Anderson-Tully Company, a lumber company, to which he devoted a material part of his time, and for which he received a salary of $12,000 in 1940, and $32,000 in 1941. Petitioner's income from Anderson-Tully Company, including his salary, was used by him as his principal means of support during 1940 and 1941. Petitioner made no withdrawals from other business activities for personal or family use in 1940 or 1941. Petitioner became interested in flying at an early date, and obtained a pilot's license in 1927. In 1934 petitioner organized Southern Air Services, Inc., which operated charter flying service and a flying training school. This business was originally set up as a corporation in order to limit petitioner's liability in case of a crash, and to prevent confusion and conflict with his other business interests. The new enterprise was a subordinate activity for petitioner, and was operated for a number of years at a loss. The first year in which it showed a net operating profit *233 was 1937, and it was 1940 before its accumulated deficit was wipe out, Petitioner was paid a salary of $150 per month, as president, commencing in 1937, but the business was always conducted by a salaried manager. In 1940 the manager was J. F. Lanier, who was paid a salary of $400 per month. He had been employed by Southern Air Services, Inc., since February of 1936. During the fall of 1940 petitioner was approached by a representative of the United States Army with a view to establishing a primary flying training school for the Army. The government contracting agent indicated that past experience made them reluctant to deal with the existing corporation, Southern Air Services, Inc., and urged petitioner to establish an independent business with a partnership form of ownership to enter into the proposed government contract. The Army had found that contractors operating Army schools in conjunction with civilian flying schools were faced with problems of divided allegiance which did not work to the best interest of the Army. The Army also objected to the fact that Southern Air Services, Inc., was a corporation. They had found it cumbersome and delaying to have to deal with corporations. *234 It was contemplated that the operation of an Army Air Force Civil Contract Primary Flying Training School would require a large original capital outlay for buildings, equipment, and initial operating expenses. Petitioner was urged by the Army to undertake the operation of the school because of his experience in the field and the urgent need then existing for flying training. Petitioner contemplated that the Army contract would take all of the time he could spare from his duties at Anderson-Tully Company, especially in the early stages of the development. Another essential for commencing the Army school would be a corps of trained instructors and mechanics, which were scarce at the time. Pursant to petitioner's decision to undertake the government contract to operate an Army flying school, the following transactions were effected: On October 31, 1941, petitioner owned all the outstanding stock in Southern Air Services, Inc., consisting of 10 shares of common and 75 shares of preferred stock. On that date he sold 7 1/2 shares of preferred stock and 1 share of common stock to J. F. Lanier for $3,166. On the same day petitioner transferred to his wife, Louise C. Kent, nine shares *235 of common stock and 67 1/2 shares of preferred stock of Southern Air Services, Inc. New certificates were issued to Lanier and Mrs. Kent to replace the ones assigned to them by petitioner. The original certificates were turned in to the company for cancellation. Also on the same day and at 5:00 P.M., a special meeting of the stockholders of Southern Air Services, Inc., was held for the purpose of taking action to dissolve the corporation and surrender its charter. Corporate resolutions were drafted which recited that Louise C. Kent was the holder of 67 1/2 shares of preferred and 9 shares of common stock; that Lanier was the holder of 7 1/2 shares of preferred and 1 share of common; that the holders of the 75 shares of common and 10 shares of preferred voted to dissolve the corporation. The resolution also recited that petitioner, president of Southern Air Services, Inc., acted as chairman of the meeting, and that Bertram W. Cohn, secretary of Southern Air Services, Inc., acted as secretary of the meeting. At 6:00 P.M. on the same day a meeting of the officers and directors of Southern Air Services, Inc., was held. The minutes of the meeting recite that petitioner, president *236 of the corporation, was elected temporary chairman, and Bertram W. Cohn, secretary of the corporation, was elected temporary secretary. The officers present at the meeting were: William R. Kent, president and treasurer J. F. Lanier, vice-president Bertram W. Cohn, secretary The same three individuals were the directors of the corporation. The minutes recite a resolution authorizing the officers as trustees in liquidation to transfer the assets of Southern Air Services, Inc., to a partnership composed of J. F. Lanier and Louise C. Kent, doing business under the name of Southern Air Services. A document designated "partnership agreement," dated October 31, 1940, was signed by Louise Campbell Kent and John Frederick Lanier. The instrument recites that Mrs. Kent and Lanier desire to carry on as partners under the name of Southern Air Services, effective as of one moment after midnight, October 31, 1940, the business formerly conducted by Southern Air Services, Inc. On the dissolution of Southern Air Services, Inc., its assets were distributed to the stockholders of record in kind; 90 percent to Mrs. Kent and 10 per cent to Lanier. This distribution amounted to a long-term capital *237 gain which Mrs. Kent reported on her income tax return for 1940, and paid the tax due thereon. The assets received by Mrs. Kent and Lanier were contributed to the new business. They were an important income-producing factor, especially in 1940, when it was becoming increasingly difficult to obtain equipment. Under the "partnership" agreement Lanier was to receive $400 per month salary, as manager. Profits, after expenses, were thereafter to be divided, 90 percent to Mrs. Kent, and 10 percent to Lanier. The foregoing transactions took place under the guidance of Cohn, an attorney in practice in Memphis, and a long-standing friend of petitioner. Since 1930 or 1931 Cohn has been legal adviser to petitioner. After the dissolution of the corporation petitioner was employed by Southern Air Services as an executive adviser at a salary of $400 per month, which was credited to his account every month. Petitioner bridged the gap between the corporation and the partnership. He consulted with Cohn and spent considerable time consulting with Lanier, who devoted his full time to running the business through December 31, 1941. Later another salaried manager was employed to take over when *238 civilian aviation became virtually nonexistent, due to the war. Mrs. Kent sometimes signed checks, and when the signature of both parties was required, signed licenses, applications and leases. She did not profess to be a business woman and did not have office accommodations at Southern Air Services. The $400 salary to petitioner by Southern Air Services was reasonable compensation for the consulting services rendered by him and in line with the salaries paid by other businesses of a similar nature at that time. He did not devote much time to Southern Air Services. Cohn was retained as counsel for Southern Air Services and consulted with petitioner and Lanier about its operations, particularly on matters concerning finance and taxes. He consulted with Mrs. Kent relatively infrequently. Petitioner was the maker or endorser of obligations of the corporation at the time of its dissolution, and he continued as such until the obligation was paid. He endorsed a renewal note after the dissolution of the corporation. At that time Southern Air Services was on a program of reduction of indebtedness. Prior to the dissolution of the corporation petitioner and Lanier were engaged in making *239 studies of aviation costs. An operating cost analysis continued into 1941. The continuity of business operations and petitioner's participation therein was not interrupted by the dissolution of the corporation. The transfers were made in conformity with the laws of the State of Tennessee governing stock transfers. Petitioner filed a Federal gift tax return for the year 1940, showing a gift of the 67 1/2 shares of preferred and 9 shares of common of Southern Air Services, Inc., to his wife at a valuation of $28,501.48. The Civil Aeronautics Association was notified by letter dated November 1, 1940, of the change in ownership to Southern Air Services, a partnership composed of Louise C. Kent and J. F. Lanier. Cohn had advised that the corporate form for Southern Air Services, Inc., was no longer desirable because it was then possible to obtain insurance to cover any crash liability, and the advantage of limited liability was negligible. He noted that the business was being subjected to double taxation and was required to conform to numerous technicalities necessary for corporations. Southern Air Services was only a financial success when it was operating under the Civil Pilot *240 Training Program, sponsored by the Civil Aeronautics Administration. This began before the war and tapered off when Pine Bluff and Helena Schools were able to take the training load. The program of training by Southern Air Services was completely shut down in 1943. Petitioner and Cohn had prepared to enter into a contract for the operation of an Army fiying school. They contemplated organizing a corporation, the entire stock of which would be owned by the two of them. On December 12, 1940, negotiations with representatives of the United States Government for a contract to operate an Army Air Force Civil Contract Primary Flying Training School at Pine Bluff, Arkansas, were consummated, and such a contract was executed between the Government and the Pine Bluff School of Aviation, a partnership recited as consisting of petitioner, Louise Kent, and Cohn. This contract required substantial capital investment for equipment, flying fields, and other facilities for training. Instructors and transportation for students from lodging to places of instruction were required. Substantial capital investment was required before any return could be realized under the contract. The contract covered *241 the period from March 22, 1941, to July 1, 1941, and provided for the training of 50 flying students at a compensation of $17 per hour. An expenditure of approximately $250,000 was called for in initial capital outlay for flying field and equipment. The total amount to be realized under the contract was less than this amount. Such a contract could be cancelled by the Government on 30 days' notice, and there was no certainty that the contract would be renewed. To meet the required capital outlay for the construction of facilities to train and house students an attempt was made to borrow money from Union Planters National Bank & Trust Co., a local banking institution. Difficulty was encountered in making the loan direct because of the great risk involved by reason of the uncertainty of the duration of the contract, the fact that it was not assignable, and the single use to which the facilities could be adapted. The Reconstruction Finance Corporation, principally because of the importance of the venture to the defense program, aided with financing. One loan was made for $175,000, evidenced by a note dated January 20, 1941, and signed by the Pine Bluff School of Aviation by "William *242 Kent (partner)." Collateral to secure this loan was 2,000 shares of Anderson-Tully Corporation, owned by petitioner, which stock had a value of $200,000. Under the terms of a further loan of $175,000, evidenced by a note dated September 5, 1941, it was provided that 30 percent of the gross revenue of the school should be assigned for its repayment. Under date of September 5, 1941, a mortgage on all buildings and equipment was given to the Union Planters National Bank as further security by Pine Bluff School of Aviation. Later the Defense Plant Corporation purchased the facility and leased it to the partnership. The loans were paid in part out of the purchase price and further bank loans were paid out of funds arising from operations. Cohn paid in $25,000 for initial expenses and was the only one of the partners who contributed cash. The Government contract, a lease, a construction contract, a loan agreement, certifications as to partners, a preliminary application for a loan, and a mortgage, were executed on behalf of Pine Bluff School of Aviation, in which documents petitioner, Louise Kent, and Cohn were stated to be partners doing business as the Pine Bluff School of Aviation. *243 The oral agreement forming the Pine Bluff School of Aviation was never reduced to writing. Petitioner and Cohn were responsible for the promotion and development of the operations. Petitioner had knowledge of flying, experience, and aptitude to enable him to supervise successfully the institution and operation of the school. He never did nay actual instructing. Petitioner gave about three days a week to the school during its organization stages, and thereafter about one day a week. He directed his attention to general supervision, including financial and over-all planning. Cohn rendered services as legal and financial adviser to the Pine Bluff School of Aviation. Mrs. Kent assisted in planning the lay-out of the school, in supervising the construction, and in planning the furnishing of quarters and landscaping. She prepared menus and organized the housekeeping. She arranged entertainment and recreation for the students. These matters were left almost entirely in her hands. Mrs. Kent was not an architect. She had no previous experience in laying out or operating air base plants. The actual operation of the Pine Bluff School of Aviation was left to full-time employees, including *244 a salaried resident manager and a corps of trained instructors. None of the partners was ever resident at the school, none ever assisted in any training, and none ever devoted his full time to the enterprise. Southern Air Services furnished trained instructors and mechanics to Pine Bluff. Such instructors were unavailable and had to be trained by Southern Air Services at its own expense. An expenditure of $35,000 for such items was eventually paid by the Pine Bluff School of Aviation within approximately a year, out of its earnings. During the summer of 1941, petitioner was approached by R. A. VanDevere with a view to organizing another flying school, Helena Aero-Tech, at Helena, Arkansas. Although VanDevere was an experienced aviation executive, he desired financial support and the benefit of petitioner's experience resulting from Pine Bluff School. On August 11, 1941, these negotiations were consummated by the execution and the recording of a limited partnership agreement between petitioner, Cohn and VanDevere. The agreement provided that Van Devere would be the general partner, and Kent and Cohn would be limited partners who would contribute $15,000 each and would receive therefore *245 a one-sixth share of the profits. On September 16, 1941, petitioner and his wife entered into an oral agreement to invest $15,000 in the Helena Aero-Tech as a joint venture. On that date Mrs. Kent delivered to him a check, drawn on her account of Southern Air Services, for $7,500. Petitioner's contribution of $7,500, was represented by a check drawn on his account in Southern Air Services. Petitioner accounted to his wife for one-half of all the income which he received for their interest in Helena Aero-Tech. Mrs. Kent's personal drawings from Southern Air Services during 1940 and 1941 were as follows: Date
Explanation
Amount
3-15-41
Income tax payment
$ 293.15
6-15-41
Income tax payment
293.15
8-15-41
Life insurance premiums
1,130.00
9-15-41
Income tax payment
293.15
9-16-41
Helena Aero Tech
(share in firm)
7,500.00
9-20-41
Life insurance premium
808.00
10-20-41
Life insurance premium
1,552.00
12-20-41
Life insurance premium
366.25
Total
$12,235.70
Mrs. Kent was not active in the management of Helena. VanDevere consulted with petitioner occasionally about various things connected with the business. Petitioner at all times *246 furnished all of the support for his family. During 1940 petitioner received $200 as a liquidating dividend from certain shares of the International Match Realization Co. which were acquired prior to 1932. The stock was the subject of a tax deduction in 1932 when it was asserted to be worthless in toto. Petitioner reported the $200 received in 1940 as a long-term taxable gain, 50 percent of which was taken into income. Respondent includes the entire $200 in 1940 income. For tax purposes the transfer of petitioner's interest in the Southern Air Services, Inc., to his wife lacked reality, and the income therefrom in the years in question and the capital gains upon the liquidation of the corporation are attributable to him. For tax purposes petitioner's wife was not a partner in the Pine Bluff School of Aviation business or the Helena Aero-Tech School business, and the income therefrom reported by his wife is attributable to petitioner. Opinion In this case we are again required to scrutinize a mass of legal forms in order to arrive at the tax consequence of numerous transactions in which both petitioner and his wife are involved. And here again the principles established by *247 the Supreme Court in its recent decisions in , and , appear to furnish the solution. Applying their doctrine to the issue in the present case relating to the Southern Air Services transactions, for petitioner to prevail we would be required to conclude that petitioner's wife "really and truly intended to join" [1] in a partnership with Lanier for the purpose of operating Southern Air Services. This we cannot do on the record before us. Petitioner's continued supervision over the business, his substantial participation in its operations, as well as the continued management of the business by Lanier, make it clear that we must conclude, as we did in : * * * The conduct of the business before and after the * * * agreement is without substantial difference. No other changes of material nature were wrought by the agreement. . Although the purported purpose of the transfer was to eliminate petitioner from any interest in Southern Air Services, a requirement *248 said to have been occasioned by the Army's desire to divorce its contract-holders from interest in civil airfields, it is obvious that this was not accomplished by the arrangement. An application of the other tests of contribution of capital or service leads to the same result. The pattern of petitioner's transfer of stock to his wife, the liquidation of the corporation, and the formation of the partnership are similar to that in Tower. The capital interest stemming from petitioner cannot be said to have originated with his wife; and she clearly contributed no managerial or vital additional services to this partnership. Our view of the entire record on this partnership is that the Kent interest in the income from the business is attributable to petitioner. ; ; . Respondent has also charged petitioner with capital gains arising from the liquidation of Southern Air Services, Inc., although the stock at the time of liquidation had been transferred to petitioner's wife. Petitioner's legal adviser had made it clear that since crash insurance was available, *249 any advantages attending the corporate form of doing business no longer existed, and that use of the corporation was needlessly subjecting earnings to double taxation. Viewing the transfer as part and parcel of the effort to make petitioner's wife a partner and having concluded that the business conducted subsequent to dissolution of the corporation continued to be under the control of petitioner, and that its profit continued to be his income, disposition of the issue relating to gain on liquidation in favor of respondent must follow, as apparently petitioner concedes by failing to make any independent argument of the point. The purported intermediate transfer of the stock to petitioner's wife, with the intention and for the purpose of an instantaneous transformation into the ensuing controlled partnership lacked reality and finality as respects the attribution of tax consequences. Whether or not the concept of bona fides is resorted to, the conclusion of an anticipatory arrangement subject to treatment as a mere formalism is required. ; . Respondent's position as to the *250 unreality of the wife's participation in the Pine Bluff partnership must also be sustained. The prime capital contribution said to be absolutely necessary to obtain the contract with the Army for the operation of the school was the "certificate of the Civil Aeronautics Authority," evidencing that Pine Bluff was "an approved Civil Institution for advanced flying training." The technical assignment of assets does not obliterate the fact that this certificate was originally within the exclusive control of petitioner as the sole stock-holder of Southern Air Services, Inc. Our conclusion that petitioner had not effectively released his control over that company must carry with it his control over the disposition of this crucial certificate. Nor does the record satisfy us as to any contribution of services by petitioner's wife. She is credited with assisting in planning the lay-out, landscaping, interior decorating, dietetics, and entertainment. Undoubtedly, she evidenced an interest in all these matters, as she did in the operation of Red Cross canteens, but she was not possessed of previous business experience along these lines and we cannot conclude that her participation was in the *251 nature of a professional contribution to a business nor that it supplies the missing element to justify recognition of a true partnership. The Helena School presents a basically similar situation, and the income from it reported by his wife must be attributed to petitioner. The conclusion is inescapable that petitioner's participation was the result of his business capacity and his experience in the establishment and direction of service flying schools. His advice was sought and obtained by the originator of the project. There is no suggestion of activity by petitioner's wife in the enterprise, and indeed she was not even a direct participant in the partnership itself. Cf. . Whether petitioner remained within the bounds of a limited partner under applicable local law seems to be as wide of the mark as the characterization of the taxpayer's relatives as general partners under state law was held to be in Lusthaus v. Commissioner, and Commissioner v. Tower. And the wife's participation in Helena profits finds no support from the aspects of the problem relating to the contribution of capital. No part of the family investment in Helena *252 can be said to have come from her. The record upon which petitioner bases his argument that his wife made a capital contribution to Helena equal to his own is no more than a disclosure of a transfer of funds from their respective accounts at Southern Air Services. The wife's portion represents Southern Air Services income which we have concluded must be attributed to petitioner, and hence cannot be said to have "originated" with her. See Such circumstances can no more justify a conclusion that the wife was petitioner's partner for tax purposes than a completed gift of property by a husband to a wife can serve as her capital contribution to substantiate, for tax purposes, a partnership between them. We perceive nothing to distinguish the Helena partnership transaction from the now inhibited anticipatory transfer of funds by a husband to his wife for the purpose of obtaining an interest by her in a partnership in which he participates. Neither party has made any argument on the merits of the International Match Realization Co. issue which relates to a $200 "dividend" received in 1940 after a previous charge-off by reason of stock worthlessness in *253 1932. The evidence is meager, but from what appears the issue of whether the recovery is ordinary income, as contended by respondent, or long-term capital gain as contended by petitioner, must be disposed of in respondent's favor on the authority of , and , affirmed . Decision will be entered under Rule 50. Footnotes
1. ↩